[Cite as *KMG Prestige, Inc. v. Riles*, 2020-Ohio-5217.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

KMG Prestige, Inc. Managing Agent
for Michaelmas Manor

        Appellee

v.

Yolanda Riles

        Appellant

Court of Appeals No. L-20-1057

Trial Court No. CVG-19-16149

**DECISION AND JUDGMENT**

Decided:  November 6, 2020

* * * * *

Robert G. Friedman and Kyle L. Ripma, for appellee.

Joseph E. Stanford, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Yolanda Riles, appeals the judgment of the Toledo Municipal Court, Housing Division, granting judgment in favor of appellee, KMG Prestige, Inc., on its complaint for eviction and restitution of the premises.  For the reasons that follow, we reverse.

## I. Facts and Procedural Background

**{¶ 2}** On February 23, 2009, appellant completed an application for an apartment in Michaelmas Manor, a federally subsidized housing complex for the elderly or disabled. On September 20, 2010, appellant's application was approved, and on October 4, 2010, she entered into a lease agreement with Michaelmas Manor.

**{¶ 3}** Under the terms of the October 4, 2010 lease, the monthly rent was set at $765, of which $594 would be paid by the Department of Housing and Urban Development ("HUD"). Appellant was responsible for the remaining $171 in rent per month. Furthermore, the lease provided, in pertinent part,

**{¶ 4}** [T]he Landlord may terminate this Agreement only under the following circumstances:

> * * * This termination must be based upon either material noncompliance with this Agreement, material failure to carry out obligations under any State Landlord or Tenant Act, or other good cause.

"Material noncompliance with this Agreement" is defined in the lease as including

> (1) one or more substantial violations of this Agreement, (2) repeated minor violations of this Agreement which disrupt the livability of the project, adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, interfere with the management of the project or have an adverse financial effect on the project, or (3) failure of the Tenant to timely supply all

2.

required information on the income and composition, or eligibility factors of the Tenant household (including failure to meet the disclosure and verification requirements for Social Security Numbers, as provided by 24 CFR Part 5, or knowingly providing incomplete or inaccurate information). Nonpayment of rent or any other financial obligation due under this Agreement (including any portion thereof) beyond any grace period permitted under State law shall constitute a substantial violation. The payment of rent or any other financial obligation due under this Agreement after the due date but within any grace period permitted under State law shall constitute a minor violation.

{¶ 5} A few months later, on January 4, 2011, appellant entered into an employment agreement with Michaelmas Manor to be the caretaker of the property. As caretaker, appellant was responsible for, among other things, acting as the property "trouble shooter" for emergency situations, including monitoring the emergency pull cords and fire alarms located in the apartment units. As compensation for appellant assuming the caretaker role, Michaelmas Manor agreed to provide rent-free housing to appellant. A new lease agreement was contemporaneously signed by appellant, which differed from the October 4, 2010 agreement only on the amount of rent. Under the January 4, 2011 lease agreement, monthly rent was set at $795, of which $624 would be paid by HUD. Appellant's rent responsibility was listed as "caretaker."

3.

**{¶ 6}** Relevant here, the caretaker employment agreement provided:

WHEREAS, Employee understands that he/she is required to leave his/her unit once he/she resigns, or is terminated from his/her employment, **regardless of cause**: the in-kind rental waiver terminates upon the resignation or termination of the Employee. If the Employee resigns or is terminated **without cause**, he/she is eligible to be transferred to a regular resident apartment at **<u>Michaelmas Manor Apts.</u>** only, provided that he/she qualifies as a subsidized tenant, having passed all screening criteria. Under no circumstances, however, can the Employee remain in the designated caretaker unit if the Employee is terminated or resigns, regardless of the cause. If the Employee is terminated or resigns with cause, or does not qualify to remain as a tenant under the subsidized screening criteria (assuming the Employee has resigned or been terminated without cause); and he/she fails to leave, this agreement shall entitle Employer-Landlord to take formal eviction if he/she has not vacated his/her unit within thirty (30) days after notice of termination or resignation or after notice that he/she does not qualify to remain as a subsidized tenant. (Emphasis sic.)

**{¶ 7}** On April 23, 2019, appellee became the managing agent for the properties at Michaelmas Manor. Two months later, on June 26, 2019, appellee notified appellant by letter that the caretaker arrangement is not permitted by HUD guidelines, employment laws, or tax laws. As a result, appellee informed appellant that she was no longer

4.

required to provide caretaker services and needed to return her keys immediately. Further, appellee stated that effective August 1, 2019, appellee could no longer grant the rent stipend for appellant's service. Finally, appellee notified appellant, "Per the lease agreement for your unit, you must vacate that unit within 30 days of this notice." Appellant did not vacate the unit.

{¶ 8} At the hearing on appellee's complaint for eviction, Mary Ellen Gardner, the regional property manager for appellee, testified that no rent was being paid on the apartment. Gardner explained that if HUD had been making payments, those payments stopped prior to appellee becoming the managing agent, but to the best of her knowledge, there was never any money received for the unit because the caretaker responsibilities were the payment for the unit. Gardner testified that the caretaker position was no longer needed, however, because the pull cord system that previously sent an alert to the notification box located in the caretaker unit now sent the alert directly to 911. Gardner took the position that per the terms of the employment agreement, appellant must leave her apartment, but is eligible to apply to be placed on a waiting list for another apartment. Michelle Smith, the community manager for Michaelmas Manor, testified that appellant did, in fact, apply to be put on the waiting list, and at the time of the hearing was sixth on that list. Smith estimated that it could be six months to a year, or up to a couple of years, before an apartment would be available.

{¶ 9} Appellant also testified at the hearing. Appellant testified that there is no difference between the apartment that she was living in as the caretaker and the other

5.

apartments in the complex except for a disabled 6-inch by 17-inch call box on the wall in the bedroom. Appellant believed that because the caretaker position was eliminated, there was no longer a "caretaker unit," and she was just living in a regular apartment. Since appellant was on a waiting list for over a year for an apartment between 2009-2010, appellant objected to being forced out of the apartment that she was in only to be put back on a waiting list. Appellant testified that she would be homeless and unable to afford housing if evicted from her apartment.

{¶ 10} Following the hearing, the magistrate entered judgment for appellee, finding, "[Appellant] was employee of [appellee]. Employer/Employee contract was terminated. [Appellee] terminated lease. [Appellee] argued [appellant] was placed on waiting list." Appellant filed objections to the magistrate's decision, arguing that it was against the manifest weight of the evidence, and that the magistrate failed to consider the equitable defenses presented by appellant. On February 25, 2020, the trial court denied appellant's objections, and adopted the magistrate's decision granting judgment in favor of appellee.

## II. Assignments of Error

{¶ 11} Appellant has timely appealed the trial court's February 25, 2020 judgment, and now asserts two assignments of error for our review:

1. The trial court erred not considering equity when it effectively required appellant to wait six months to a year for housing when she already lives in an apartment that suffices.

6.

2.  The trial court erred when it construed the employment agreement as a fully integrated writing despite the ambiguity created by KMG when it eliminated the caretaker position not contemplated by either party when the agreement was originally signed.

### III.  Analysis

{¶ 12} Because we find appellant's second assignment of error dispositive, we will begin and end our analysis there.  In her second assignment of error, appellant argues that the employment agreement was ambiguous, and that the agreement should be interpreted to allow appellant to remain in her apartment.

{¶ 13} "Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 38.  "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.  "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.*  "On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." *Id.* at ¶ 12.

{¶ 14} Appellant argues that the employment agreement is ambiguous in that it states that if appellant resigns or is terminated without cause, she is "eligible to be transferred to a regular resident apartment at Michaelmas Manor Apts. only, provided

7.

that he/she qualifies as a subsidized tenant, having passed all screening criteria."[1] Appellant contends that the use of the phrase "transfer" implies that appellant is immediately eligible to relocate to a regular resident apartment.

{¶ 15} Appellee, on the other hand, argues that the contract language is clear and unambiguous, and provides that upon termination, appellant had 30 days to vacate the caretaker unit in accordance with the phrase "[u]nder no circumstances, however, can the Employee remain in the designated caretaker unit if the Employee is terminated or resigns, regardless of the cause." Furthermore, appellee argues that appellant's interpretation that she is immediately eligible to relocate to a regular resident apartment is unreasonable because it would result in appellant being moved to the top of the existing waiting list.

{¶ 16} Upon our review of the employment agreement, we find that it is ambiguous as to what the obligations of the parties are where, as here, the caretaker position is permanently eliminated. The terms of the employment agreement require that "[u]nder no circumstances * * * can the Employee remain in the designated caretaker unit if the Employee is terminated or resigns, regardless of the cause." The use of the phrase "designated caretaker unit," as contrasted with the "regular residential apartment" to which appellant would be eligible to transfer, indicates that the caretaker unit serves a distinct purpose. Indeed, the witnesses at the hearing testified that the designated

---

[1] The parties do not dispute that appellant qualifies as a subsidized tenant.

8.

caretaker unit was equipped with a call box to allow the caretaker to respond to emergencies. As such, it is reasonable that the employment agreement would require the former caretaker to vacate the designated caretaker unit so that the new caretaker could assume his or her duties. In this case, however, the caretaker position was eliminated, and the call box was disabled.

{¶ 17} Appellee's interpretation under these facts is that, whether through termination or elimination, appellant is no longer the caretaker. Because the language of the employment agreement states that "under no circumstances" can she remain in the designated caretaker unit when she is no longer the caretaker, "regardless of the cause," appellee argues that appellant must vacate the apartment.

{¶ 18} Appellant argues, on the other hand, that the employment agreement provides that appellant is eligible to immediately transfer to a regular resident apartment, which—because the caretaker position has been eliminated and the call box disabled— includes her current apartment. Appellee counters that this interpretation is unreasonable because it would result in appellant moving to the top of the waiting list. We disagree with appellee's position, however, because it fails to recognize that appellant has already been through the waiting list process in 2009-2010, and has obtained the status of a current tenant.

{¶ 19} Finally, a third reasonable interpretation is that through the elimination of the caretaker position and the disabling of the call box, there is no longer a "designated

9.

caretaker unit," and thus there is no contractual requirement that appellant must vacate the apartment.

{¶ 20} Therefore, since the language of the employment agreement is "susceptible to two or more reasonable interpretations," we hold that it is ambiguous, and we turn to extrinsic evidence to determine the parties' intent. *LublinSussman Group LLP v. Lee*, 2018-Ohio-666, 107 N.E.3d 724, ¶ 20-21 (6th Dist.).

{¶ 21} Here, the extrinsic evidence consists of appellant's apartment application and lease agreements with Michaelmas Manor. The extrinsic documents reveal that appellant applied for an apartment in February 2009, waited for well over a year for an apartment to become available, and then ultimately entered into a lease agreement in October 2010. For two months, appellant paid her portion of the rent with HUD paying the remaining portion. Appellant then agreed in January 2011 to assume the caretaker responsibilities as an in-kind payment of her portion of the rent. Notably, both the October 2010 and January 2011 lease agreements provided that Michaelmas Manor may terminate the lease agreement *only* upon material noncompliance with the agreement, which included failure to pay rent beyond any grace period.[2]

{¶ 22} Upon consideration of the extrinsic evidence, we find that because Michaelmas Manor could only terminate the lease for nonpayment of rent, and because appellant had already progressed through the waiting list process and paid rent for two

---

[2] The lease agreement provides additional justifications for termination that are not relevant here.

months before agreeing to provide caretaker services as her rent payment, and because the employment agreement provided that she would be eligible to transfer to a regular resident apartment if she resigned or was terminated without cause and was otherwise eligible, the intent of the parties was that appellant would not be required to vacate the apartment, reapply, and go through the waiting list process again if the caretaker position was eliminated, but that she would be required to resume her payment of her portion of the rent obligation. Therefore, we hold that the trial court erred when it awarded judgment to appellee on its complaint for eviction and restitution of the premises.

{¶ 23} Accordingly, appellant's second assignment of error is well-taken.

{¶ 24} In light of our holding, appellant's first assignment of error is not well-taken as moot.

### IV. Conclusion

{¶ 25} For the foregoing reasons we find that substantial justice has not been done the party complaining, and the judgment of the Toledo Municipal Court, Housing Division, is reversed and vacated. Judgment is entered in favor of appellant on appellee's complaint for eviction and restitution of the premises. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed<br>
and vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Arlene Singer, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.